# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)*<br><br>In the Matter of the Search of one black iPhone, Glendale Police Department Tag Number 30045846 and Item Number 38 | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 2:21-MJ-05718 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |
| 21 U.S.C. § 864 | Conspiracy and Attempt to Distribute Controlled Substances |

The application is based on these facts:

See attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Elijah Adams
_____
*Applicant's signature*

DEA Special Agent Elijah Adams
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, CA_____

Honorable Gail J. Standish
_____
*Printed name and title*

AUSA: Ashley Fillmore x2416

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital device (the "SUBJECT DEVICE"), seized on June 8, 2021 and currently maintained in the custody of Glendale Police Department in Glendale, California:

1.    One black iPhone, Serial Number: Unknown; IMEI: Unknown; Glendale Police Department ("GPD") Tag Number 30045846 and GPD Item Number 38 (the "SUBJECT DEVICE"), in the custody of GPD, in Glendale, California.

**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

d.   Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

e.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

f.   Contents of any calendar or date book;

g.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

h.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

i.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as

ii

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

II.   <u>**SEARCH PROCEDURE FOR THE SUBJECT DEVICE**</u>

3.   In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant. The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data

to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

          ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

          iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques [, including to search for known images of child pornography.]

     e.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

     f.  If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

     g.  If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

     h.  If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies

of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICE, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   During the execution of this search warrant, law enforcement is permitted to (1) depress Michael THACKER's thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICE (only if the device has such a sensor), and direct which

specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of THACKER's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

6.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Elijah D. Adams, being duly sworn, declare and state as
follows:

### I.  <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is also made in support of an
application for a warrant to search one black iPhone, Glendale
Police Department ("GPD") Tag Number 30045846 and GPD Item
Number 38 (the "SUBJECT DEVICE"), in the custody of GPD, in
Glendale, California, as described more fully in Attachment A.

2.    The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of 21
U.S.C. § 841(a)(1) (possession with intent to distribute
controlled substances) and 21 U.S.C. § 846 (conspiracy and
attempt to distribute controlled substances (the "Subject
Offenses"), as described more fully in Attachment B. Attachments
A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses. This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrant,
and does not purport to set forth all of my knowledge of or
investigation into this matter. Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

4.   I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA"), and have been so employed since February 2020. From October 2020 through February 2020, I received extensive instruction at the DEA Academy in Quantico, Virginia, regarding the investigation of violations of the Controlled Substances Act and criminal conspiracies involving the smuggling and distribution of narcotics and dangerous drugs. During the course of my employment with DEA, I have assisted in investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of narcotics and other controlled substances, and conspiracies associated with narcotics and controlled substance offenses. I have also been involved in narcotics-related arrests that have resulted in the seizure of narcotics and other evidence. I am familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics, and the collection of money, which represents the proceeds of narcotics trafficking, and money laundering.

5.   During my employment with DEA, I have used a variety of investigative techniques and resources, including, but not limited to, surveillance, use of confidential sources, undercover operations, telephone toll analysis, installation, monitoring, and retrieval of trackers, search warrants, and wire intercept communications analysis.

6.    Additionally, I am a member of the High Intensity Drug Trafficking Area ("HIDTA") Tactical Diversion Squad 2 ("TDS2"), which is tasked with investigating diversion-related crimes within the Los Angeles Field Division.

### III.  SUMMARY OF PROBABLE CAUSE

7.    On June 8, 2021, after witnessing a hand-to-hand drug transaction between Michael THACKER AND James ORTH, members of GPD detained THACKER. At that time, GPD detectives conducted a pat-down search of THACKER and located the SUBJECT DEVICE.

8.    On that same date, GPD detectives executed a search warrant at THACKER's residence on Santa Monica Boulevard in West Hollywood, California. During the service of the search warrant GPD detectives seized approximately 784 grams of cocaine, approximately 19.5 grams of cocaine base, approximately 139 grams of methamphetamine hydrochloride,[1] and approximately 894 grams of a yellow substance suspected to be fentanyl,[2] all located in a bedroom controlled by THACKER.

### IV. STATEMENT OF PROBABLE CAUSE

9.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

---

[1] The cocaine, cocaine base, and methamphetamine hydrochloride have been tested by DEA Southwest Laboratory.

[2] The suspected fentanyl is pending analysis at the DEA Southwest Laboratory.

### A. Source of Information Identifies a Narcotics Trafficker Named "Big Mike"

10. Based on my review of a GDP search warrant and an in-person meeting with GDP detectives, I know that on March 25, 2021, members of GPD met with a Source of Information ("SOI") who stated he/she knew of a narcotics trafficker with the moniker "Big Mike" (later identified as Michael THACKER). The SOI stated that Big Mike sells narcotics and usually meets in the area of Big Mike's residence on Santa Monica Boulevard in West Hollywood, California. The SOI also stated that Big Mike drives a red Dodge Challenger. The SOI described Big Mike as a white male, approximately six feet tall, and heavily tattooed.

### B. GPD Identifies THACKER as Big Mike

11. I know from my review of a GDP search warrant that on May 4, 2021, members of GPD conducted surveillance at Big Mike's apartment complex, i.e., the address provided by the SOI. At approximately 7:30 a.m., GPD Detective Ryan Sandlin gained access to the underground parking lot and located a red Dodge Challenger. A registration check of the vehicle showed it was registered to Michael THACKER at an address on 186th Street in Artesia, California. The Dodge Challenger was parked in tandem in a designated parking stall with a Blue Honda Accord. Based on the California Department of Motor Vehicle ("DMV") photograph associated with the registration of the red Dodge Challenger, GPD Detective Dylan Montes confirmed THACKER's identity.

12. On that same date, at approximately 10:12 a.m., GPD Detective Gandara saw the Blue Honda Accord leave the parking

lot and drive east bound on Santa Monica Boulevard. GPD Detective Montes drove next to the Blue Honda and identified the driver as THACKER.

### C. GPD Observes THACKER Engage in Hand-to-Hand Narcotics Transaction

13. According to a GDP search warrant which I reviewed, on June 8, 2021, members of GPD conducted surveillance at THACKER's residence. At approximately 7:30 a.m., Detective Cornejo went to the parking lot and saw THACKER's red Dodge Challenger parked in the lot.

14. Approximately one hour later, GPD Detective Montes observed THACKER and a female, later identified as Hanna HOBBS, riding motorized scooters southbound on Poinsettia Place in the area of THACKER's apartment complex. THACKER and HOBBS met with a male later identified as James Lawrence ORTH on Poinsettia Place, in the street. GPD Detective Montes observed THACKER reach into his sweatshirt pocket with his right hand and give a small item to ORTH. ORTH reached into his front right pocket and handed THACKER an unknown amount of United States Currency ("USC"). THACKER and HOBBS then separated from ORTH and rode their scooters north bound on Poinsettia Place to the Smart and Final grocery store located at 1041 North Fuller Avenue, which is adjacent to THACKER's apartment. Based on my training and experience, I believe THACKER and ORTH conducted a narcotics transaction.

### D. GPD Recovers Methamphetamine from Hand-to-Hand Transaction

15.   Based on the information the SOI provided regarding THACKER and after witnessing what GPD Detectives believed to be a hand-to-hand transaction between THACKER and ORTH. GPD Detectives detained ORTH, THACKER, and HOBBS after the transaction occurred and after the two parties had separated. During the detention, GPD detectives identified ORTH by his California Driver's License.  Inside of ORTH's front pocket, GPD Detectives retrieved a small plastic baggie containing a white crystal substance consistent with methamphetamine. Inside of ORTH's coin pocket, GPD Detective Montes located another small plastic baggie with an unknown substance believed to be narcotics. ORTH admitted that THACKER had sold him the suspected methamphetamine for $5.00.

### E. GPD Arrests THACKER and Identifies His Residence

16.   At approximately the same time, GPD Detectives detained THACKER and HOBBS at the Smart and Final parking lot. While THACKER was being detained, GPD Detective Cornejo asked THACKER if he had any drugs or weapons currently on him to which THACKER stated he did not. GPD Detective then asked THACKER "Is it okay if I check?" to which THACKER responded, "Absolutely". GPD Detective then conducted a pat-down search of THACKER. During the pat down search of THACKER, GPD Detective Cornejo removed the SUBJECT DEVICE, a bill fold, a receipt, United States Currency and other miscellaneous items out of the front pocket of THACKER's gray sweatshirt.

17.    During biographical questioning, THACKER and HOBBS
stated they were staying at 7316 Santa Monica Boulevard,
Apartment 114, West Hollywood, California ("THACKER's
Residence"). THACKER initially told Detectives that he did not
have a key to the apartment and would access it through the back
entrance. THACKER admitted his Dodge Challenger was parked in
the subterranean lot. THACKER told GPD Detective Montes that he
had a key fob in his possession which would allow access to the
parking structure and apartment unit 114. HOBBS stated there
were approximately six other people inside the residence.

18.    Based on the fact that GPD Detectives had detained
ORTH, HOBBS, and THACKER within view of the apartment complex
and the fact that HOBBS admitted there were other people inside
the residence, GPD Detective Montes believed there was a high
likelihood of the other residents destroying or hiding potential
evidence inside the residence.

19.    GPD Detectives used the key fob in THACKERS possession
to unlock the front door to THACKER's residence and "froze"[3] the
location pending the signing of a state search warrant. Using a
key found on THACKER's key chain, GPD Detective Landsberger
gained access to a locked room in the southwest corner of the
upstairs ("THACKER's bedroom").

---

[3] "Freezing" a location refers to the practice of detaining
suspects within a location/residence in order to secure the
premises and prevent the destruction of evidence, pending the
signing of a search warrant.

**F.   GPD Searches THACKER's Residence and Finds Narcotics and Indicia of Narcotics Distribution**

20.   On June 8, 2021, at approximately 12:08 p.m., the Honorable Rubiya Nur of the Superior Court of the State of California, County of Los Angeles, signed a search warrant for 7316 Santa Monica Boulevard, Apartment #114, West Hollywood, California.

21.   I reviewed a GPD report, as well as body worn video, from which I learned that during GPD's search of THACKER's bedroom, inside of an open safe, GPD Detectives seized approximately 784 grams of cocaine, approximately 19.5 grams of cocaine base, approximately 139 grams of methamphetamine hydrochloride, and approximately 894 grams of a yellow substance suspected to be fentanyl.

22.   During the search of the residence, inside of THACKER's bedroom, GPD Detectives found a pay/owe notebook. Inside of the notebook, the following was written on a post-it note: "G12839691 model#: SFW123(ES)(GSC)." An open-source internet inquiry for the term SFW123ES shows that SFW123ES is the model number for a Sentry Safe.

23.   Also, inside the notebook, paperclipped to a page are five parking tickets. Four of the parking tickets were written to THACKER's red Dodge Challenger.

24.   Based on the hand-to-hand transactions witnessed by GPD and the items seized during the search of THACKER's bedroom, THACKER was arrested by GPD. The SUBJECT DEVICE was seized by

GPD and processed as evidence with GPD Item Number 38 and GPD Tag Number 30045846.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

25.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In

addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.   Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

26. As used herein, the term "digital device" includes the SUBJECT DEVICE.

27. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur

after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain

11

"booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

28.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data in a short period of time for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

29.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices. To use this function, a user generally

displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

   b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

   c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress THACKER's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of THACKERS's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

30.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

31.  For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
_____, 2020.


_____